UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH BLAIN, individually and on behalf of all others similarly situated,<br><br>                                    Plaintiff,<br><br>v.<br><br>LIBERTY MUTUAL FIRE INSURANCE COMPANY,<br><br>                                    Defendant. | Case No.:  22-cv-00970-AJB-MMP<br><br>**ORDER**<br><br>**(Doc. Nos. 84; 102; 133)** |

    Before the Court are Plaintiff Sarah Blain's ("Plaintiff") motion for class certification (Doc. No. 84), Defendant Liberty Mutual Fire Insurance Company's ("Liberty Mutual") motion to exclude testimony of Allan I. Schwartz (Doc. No. 102), and Liberty Mutual's motion to stay the proceedings (Doc. No. 133). For the reasons set forth herein, the Court **DENIES without prejudice** Plaintiff's motion for class certification and **GRANTS** Liberty Mutual's motion to exclude and motion to stay.

## I.    BACKGROUND

    Plaintiff, who has held and currently holds a policy for personal auto insurance from Liberty Mutual, alleges that Liberty Mutual failed to issue adequate refunds in response to the COVID-19 crisis. (First Am. Class Action Compl. ("FAC"), Doc. No. 31.) This failure, Plaintiff alleges, violated the putative class member's reasonable expectation that Liberty

Mutual would only collect premiums limited to "no more than a fair rate of return, and to have that rate adjusted if it became excessive," thus breaching its duty of good faith and fair dealing. (*Id.* ¶¶ 55–58.)

On March 19, 2020, Governor Gavin Newsom issued an order mandating "all individuals living in the State of California to stay home" to slow the spread of the COVID-19 virus. (*Id.* ¶¶ 15–17.) Plaintiff alleges that unlike many who suffered during the pandemic, Liberty Mutual "scored a windfall" because of the dramatic reduction in driving and car accidents related to the stay-at-home orders. (*Id.* ¶¶ 3, 19.) Plaintiff contends this decrease in driving-related accidents significantly reduced the number of claims that Liberty Mutual paid, "resulting in a drastic and unfair increase in Liberty Mutual's profits at the expense of its customers." (*Id.*)

In April 2020, the Insurance Commissioner for the California Department of Insurance ("CDI"), issued a Bulletin ordering private passenger automobile and other insurers to "make an initial premium refund for the months of March and April to all adversely impacted California policyholders[.]" (Doc. No. 84-1 at 156–58.) The CDI's order "grant[ed] each insurer reasonable flexibility in determining how best to quickly and fairly accomplish the refund of premium," and expressly stated that such refunds may be made "without prior approval by the Department of Insurance if they apply a uniform premium reduction for all policyholders in an individual line of insurance, for recent, current, and upcoming policy periods or any portion thereof." (*Id.* at 157.)

Sometime in spring 2020, Liberty Mutual issued an initial 15% refund to personal auto insurance customers for two months' worth of premiums and then a subsequent 5% refund of twelve months' worth of premiums for policyholders who held an active policy from June 2020 through May 2021. (FAC ¶¶ 30–31.) However, Plaintiff alleges Liberty Mutual failed to issue adequate refunds because putative class members should have received "a 30% minimum average premium refund . . . to correct [Liberty Mutual's] unfair windfall just for the time period from mid-March through the end of April 2020." (*Id.* ¶¶ 28, 32, 73.) Finally, Plaintiff asserts that under its insurance policies, Liberty Mutual "has the

discretion to make voluntary downward premium adjustments based on an insured's changed circumstances"; however, it "improperly exercised that discretion by failing to issue refunds of the now-excessive premiums during changed circumstances[.]" (*Id.* ¶¶ 35–36.)

Plaintiff filed the original complaint in this Court on July 1, 2022. (*See* Doc. No. 1.) On March 9, 2023, the Court granted in part and denied in part Liberty Mutual's motion to dismiss Plaintiff's complaint, (Doc. No. 27), and on April 7, 2023, Plaintiff filed the operative complaint, (*see generally* FAC). On May 22, 2023, the Court granted Liberty Mutual's partial motion to dismiss the FAC, dismissing Plaintiff's claim brought pursuant to California's Unfair Competition Law ("UCL"). (Doc. No. 38.) Plaintiff's remaining claim is for violation of the implied covenant of good faith and fair dealing. (*See generally id.*; FAC.)

Outside of the process of the instant litigation, on August 1, 2023, the CDI and Liberty Mutual entered a Settlement Stipulation and Order (the "Settled Order") that directed the latter to pay its insureds a third COVID-19 related refund. (*See* Doc. No. 74 at 2 (citing Doc. No. 54-1 at 6–7).) In light of the Settled Order, Liberty Mutual filed a motion for judgment on the pleadings, arguing the doctrine of primary jurisdiction applies and Plaintiff's remaining claim is precluded as a matter of law. (Doc. No. 54.) The Court denied Liberty Mutual's motion, declining to apply primary jurisdiction doctrine and finding that the Settled Order does not preclude claims by policyholders on any of the grounds raised. (Doc. No. 74.)

On May 30, 2024, Plaintiff filed the instant motion for class certification (Doc. Nos. 82 (sealed); 84 (public)), supported by a declaration from expert Allan I. Schwartz (Decl. of Allan I. Schwartz ("Schwartz Decl."), Doc. Nos. 82-1 at 83–101 (sealed); 84-1 at 80–98 (public)).[1] On August 19, 2024, Liberty Mutual filed its opposition to Plaintiff's motion

---

[1]    Attached to his declaration, Schwartz provides, *inter alia*, his curriculum vitae (Curriculum Vitae of Allan I. Schwartz ("Schwartz CV"), Doc. No. 84-1 at 99–112), an excerpt of the Actuarial Standard of

(Doc. Nos. 93 (sealed); 94 (public)) and four supporting declarations (Doc. Nos. 95 (public); 96 (public); 97 (public); 98 (public); 130 (sealed)). Two days later, Liberty Mutual filed the instant motion to exclude Schwartz's report upon which Plaintiff's motion for class certification relies, relying on the report of its own actuarial expert, Nancy Watkins. (Report of Nancy Watkins & Rebuttal to Expert Decl. ("Watkins Report"), Doc. No. 102-4.)[2] On October 15, 2024, Plaintiff filed both an opposition to Liberty Mutual's motion to exclude (Doc. Nos. 115 (sealed); 116-2 (public)), and a reply in support of her motion (Doc. No. 114), which included a rebuttal declaration by Schwartz (Rebuttal Decl. of Allan I. Schwartz ("Schwartz Rebuttal Decl."), Doc. No. 114-2 (public); 113 (sealed)). On November 5, 2024, Liberty Mutual filed a reply in support of its motion to exclude (Doc. No. 126) with a rebuttal report by Watkins (Nancy Watkins Rebuttal Report ("Watkins Rebuttal"), Doc. Nos. 125 (sealed); 126-3 (public)).

On December 30, 2024, Liberty Mutual filed a motion to stay the instant action, pending resolution of two appellate cases that Liberty Mutual argues impact "whether this action can proceed at all." (Doc. No. 133-1.) On January 28, 2025, Plaintiff filed an opposition (Doc. No. 138), to which Liberty Mutual replied (Doc. No. 139).

## II.    MOTION TO EXCLUDE

Liberty Mutual's motion brought pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert*"), 509 U.S. 579 (1993), seeks to exclude the expert that Plaintiff relies upon in her class certification arguments, Allan I. Schwartz. Because resolution of this motion affects the evidence the Court relies on in deciding the motion for class certification, the Court addresses Liberty Mutual's motion to exclude first, as a threshold matter.

///

---

Practice Number 1 (Doc. No. 84-1 at 113–36), and a list of six documents he reviewed as a part of his opinion (Doc. No. 84-1 at 138).

[2]    The same Watkins Report is additionally filed at Docket Number 95-4, in support of Liberty Mutual's opposition to Plaintiff's motion for class certification.

### A.    Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Pursuant to Rule 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "[T]he proponent of the expert . . . has the burden of proving admissibility." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (quoting *Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).

"In evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*." *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020) (quoting *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018)) (cleaned up). Specifically, "[u]nder *Daubert*, 'the district court judge must ensure that all admitted expert testimony is both relevant and reliable.'" *Id.* (quoting *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017)).

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)); *see also Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995) (defining relevance or "fit" as an inquiry into whether the testimony "logically advances a material aspect of the proposing party's case").

"The question of reliability probes whether the reasoning or methodology underlying the testimony is scientifically valid." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017) (citation and internal punctuation omitted). The Supreme Court has "identified

four factors that may bear on the analysis [of reliability]: (1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Id.* (citing *Daubert*, 509 U.S. at 593–94). "Ultimately, 'the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology.'" *Elosu*, 26 F.4th at 1024 (quoting *Daubert II*, 43 F.3d at 1318).

"[W]hether a 'full' or 'limited' *Daubert* analysis should be applied may depend on the timing of the class certification decision." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1031 (9th Cir. 2024). "[W]here[, as here,] an expert's model has yet to be fully developed, a district court is limited at class certification to making a predictive judgment about how likely it is the expert's analysis will eventually bear fruit." *Id.* "This still requires determining whether the expert's methodology is reliable, so that a limited *Daubert* analysis may be necessary, but the more full-blown *Daubert* assessment of the results of the application of the model would be premature." *Id.*; *cf. Sali*, 909 F.3d at 1006 (holding that "admissibility must not be dispositive" but rather "go to the weight that evidence is given at the class certification stage").

## B.     Schwartz's Expert Testimony

Schwartz is the president of an actuarial consulting firm he started in 1984. (Schwartz Decl. ¶ 1; Schwartz CV at 103.) Throughout his time as an actuary, Schwartz has served as an Assistant Commissioner with the New Jersey Department of Insurance (May 1988–January 1990) and a Chief Actuary for the North Carolina Department of Insurance (June 1986–April 1988). (Schwartz Decl. ¶ 1.) He has also provided expert actuarial testimony regarding insurance issues, including those related to automobile insurance, for administrative and court proceedings. (*Id.* ¶ 5.)

With regard to the instant motion for class certification, Plaintiff enlisted Schwartz to opine on calculating class-wide damages considering the impact of the COVID-19 pandemic on automobile insurance costs in California, the premium Liberty Mutual

6

charged, and California's regulatory environment. (*Id.* ¶ 12.)

Schwartz asserts that "[t]he harm for each class member can be calculated as the amount by which the net price charged by Liberty to that policyholder (taking into account any premium relief provided by Liberty) exceeded a fair price amount taking into account the impact of the COVID-19 pandemic." (*Id.* ¶ 16.) Schwartz reduces this concept to the following formula:

$$H(I,J) = RC(I,J) - AC(I,J)$$

(*Id.* ¶ 45.) The harm for a specific class member's specific policy (H(I,J)) is the difference between a "reasonable credit" for that class member (RC(I,J)) and the actual credit Liberty Mutual provided through its refund programs (AC(I,J)). (*Id.*) Schwartz then explains that the reasonable credit will be calculated by multiplying that specific class member's policy premium during the applicable time period (PP(I,J)) by "the appropriate/reasonable premium credit/refund percentage" (B). (*Id.*) Considering how each variable has been defined, Schwartz then simplifies his equation to:

$$H(I,J) = PP(I,J) \times ( B(I,J) - A(I,J) )$$

(*Id.*) Essentially, harm to a specific class member (H(I,J)) is the product of the premium paid (PP(I,J)) and the difference between what would have been a reasonable percent refund (B(I,J)) and what percent refund Liberty Mutual actually gave (A(I,J)).

Schwartz states that both the premium paid (PP(I,J)) and the actual percentage refund factor Liberty Mutual used (A(I,J)) are "clearly known" and available in Liberty Mutual's records. (*Id.* ¶ 48.) With regard to the reasonable percent refund (B(I,J)), Schwartz asserts:

> [It] can be determined from Liberty [Mutual]'s records, which would show its experience reflecting the impact of COVID. The information from Liberty's records that will be used in our analysis of the values for B(I,J) include claim frequency, claim severity, pure premiums and loss ratios. The value of B(I,J) can be determined on a class-wide basis since it would be evaluated based upon the overall experience of Liberty. It would not depend in any manner on the characteristics of any individual Class Member. It could

vary by time period, but in any time period the value of "B" would be the same for every Class Member.

(*Id.* ¶¶ 48–49; *see also id.* ¶ 17 ("The information from Liberty's records that will be used in my analysis include claim frequency, claim severity, pure premiums and loss ratios.").)

### C. Analysis

Liberty Mutual challenges Schwartz's opinion and methodology as failing both the reliability prong and the relevance prong of *Daubert*. The Court will address each challenge in turn.

#### 1. Reliability

First, Liberty Mutual argues that Schwartz's methodology has no indicia of reliability. (Doc. No. 102-1 at 15–18.) In opposition, Plaintiff counters that the methodology "is grounded upon [Schwartz's] decades of experience as an actuary calculating insurance rates, well-worn actuarial standards, and California-specific statutes and regulations." (Doc. No. 116-2 at 18–19.)

##### i. Potential Error Rate

Plaintiff asserts that the lack of a known error rate does not undermine the reliability of Schwartz's methodology because it does not rely on sampling. (Doc. No. 116-2 at 23; Schwartz Rebuttal Decl. ¶ 37 ("[B]ecause it uses the total experience[,] therefore there is no sampling error at all.").) However, Liberty Mutual argues that, because actuarial projections are "inherently uncertain and actual results will vary from the projected values," an actuary typically provides a quantifiable "confidence interval or 'reasonable ranges.'" (Doc. No. 126 at 14; Watkin Rebuttal ¶ 36.)

"[I]n the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation." *Daubert*, 509 U.S. at 594 (citations omitted). However, where the expert testimony is non-scientific or where the expert is simply drawing conclusions from a survey of other's research, the rate of error is not an applicable factor for courts to consider in analyzing reliability. *See Hangarter v. Provident Life &*

*Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) ("Concerning the reliability of non-scientific testimony[, however], the *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it.") (emphasis in original) (citation omitted); *Lust ex rel. Lust*, 89 F.3d at 597 ("The last two factors—testing and rate of error—do not apply, however, when the expert has not done original research, but rather has surveyed available literature and drawn conclusions that differ from those presented by the scientists who performed the original work.").

Plaintiff does not argue that Schwartz's testimony, which is based on actuarial science, is non-scientific. Rather, Plaintiff only argues that Schwartz's methodology does not sample, thus there is no possibility for sampling error. However, without addressing the other bases for error or expressly arguing that Schwartz's opinion is non-scientific, knowledge- and experience-based testimony, Plaintiff has not demonstrated that, at best, this factor is inapplicable to the instant case or that, at worst, it weighs against the reliability of Schwartz's methodology. The Court finds that a lack of error rate weighs against the reliability of Schwartz's methodology.

### ii.    Peer Review and Publication

Liberty Mutual notes that Schwartz's methodology has never been published or publicly presented, which weighs against its reliability. (Doc. No. 102-1 at 15 (citing Schwartz Dep. 221:15–23).) In opposition, Plaintiff asserts that this factor does not apply to the instant case because Schwartz has yet to perform his analysis and, thus, it cannot have been reviewed yet. (Doc. No. 116-2 at 23.) In reply, Liberty Mutual countered that the methodology can be evaluated without the specific calculations for the instant case having been conducted. (Doc. No. 126 at 14.)

"Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication." *Daubert*, 509 U.S. at 593. "Peer review and publication do not, of course, guarantee that the conclusions reached are correct; . . .

9

[however, t]hat the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists, i.e., that it meets at least the minimal criteria of good science." *Daubert II*, 43 F.3d at 1318; *see also Daubert*, 509 U.S. at 593 ("[Although s]ome propositions . . . are too particular, too new, or of too limited interest to be published[,] submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected.").

Although not raised in this context, both Liberty Mutual and Plaintiff point to other situations where Schwartz issued similar declarations. (*See e.g.*, Doc. Nos. 102-1 at 11–12 (citing *Day v. GEICO Cas. Co.*, No. 21-CV-02103-BLF (N.D. Cal.) and *Chavez v. Allstate Northbrook Indemnity Co.*, No. 22-CV-00166-AJB-MMP (S.D. Cal.)); 116-2 at 16 (citing *Day*); Watkins Rebuttal ¶ 15 (citing *Chavez*).) Considering that Schwartz proposed this methodology in previous cases, including the *Day* case in 2022, it would appear there may have been sufficient time to seek peer review, publication, or other methods of independent verification; however, Schwartz has chosen not to. Plaintiff does not argue the methodology is too specific or of too limited interest for the actuarial community to decline to review it. *Cf. Daubert*, 509 U.S. at 593. The Court finds that this factor weighs against a finding of reliability.

### iii.    Acceptance in the Actuarial Science Community

Next, Liberty Mutual makes a number of arguments that Schwartz's methodology is not generally accepted by the actuarial science community, including that the methodology has no name, it has not been recognized, considered, or implemented by another actuary or actuarial body, and that it is at odds with "the CDI's methodology used for the express purpose of evaluating COVID-19 premium performance." (Doc. No. 102-1 at 15, 17.)

Plaintiff contends that the methodology is "based on scientifically valid actuarial principles." (Doc. No. 116-2 at 21–22.) Specifically, Schwartz "proposes to evaluate the impact of COVID-19 using standard actuarial measures, such as claim frequency, claim

severity, pure premiums and loss ratios." (*Id.* at 21.) Additionally, although the overall methodology has no specific name, the "components of that methodology are well-recognized and named," including "[t]he loss ratio and pure premium methods." (*Id.*; Schwartz Rebuttal Decl. ¶¶ 33, 36, 120.)

Liberty Mutual counters that Schwartz "never explains *what* either of those methods calculate, *where* either method fits into his calculation, or *how* they apply to the facts this case." (Doc. No. 126 at 12 (emphasis in original).)

Consideration of the general acceptance factor requires "identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." *Daubert*, 509 U.S. at 594 (citation omitted). "Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism." *Id.* (citation omitted).

Plaintiff has sufficiently demonstrated that concepts such as "loss ratio" and "pure premium" are well accepted by the actuarial community for measuring insurance experience. However, it is unclear how these methods will be implemented in this case because they are merely aspects that Schwartz will "evaluate" or "consider" in his analysis to derive the amalgamative "B-factor." (*See, e.g.*, Schwartz Rebuttal Decl. ¶¶ 57 n.32 ("The derivation of that factor is based on the analysis of a variety of statistical measures and actuarial procedures."), 114 ("Every item listed by LM will be considered in my analysis."), 119 ("The data that LM cites, which were referenced in my declaration, will be used to determine the numerical value of the parameters of B(I,J) that are an input to the formulas.").)

This lack of clarity is compounded by the way Schwartz uses the terms data and methodology interchangeably, although they are different scientific concepts. (*Compare* Schwartz Rebuttal Decl. ¶ 33 ("Furthermore, the loss ratio and pure premium methods of analyzing insurance experience are well accepted.") *with* Schwartz Rebuttal Decl. ¶ 120 ("The data used will include loss ratios and pure premiums.").)

Although Schwartz repeatedly asserts that "[t]he value of the appropriate premium relief value is an evidentiary matter for the merits portion of the case and is not something that can be resolved during class certification" (Schwartz Rebuttal Decl. ¶ 134), this is a determination for the Court—not Plaintiff's expert—to make. Neither Plaintiff nor Schwartz have proffered any evidence as to why Schwartz was unable to provide more detail or to review the documents provided in discovery. Plaintiff does not assert that the documentation necessary for Schwartz to complete his analysis was still in the hands of Liberty Mutual at the time he was completing either his declaration or his rebuttal declaration. (*Cf.* Doc. No. 116-2 at 16 (quoting *Day v. GEICO Cas. Co.*, No. 21-CV-02103-BLF, 2022 WL 16556802, at *4 (N.D. Cal. Oct. 31, 2022)).)

Accordingly, the Court finds this factor weighs against a finding of reliability as Plaintiff has not demonstrated how Schwartz's methodology for deriving his B-factor is generally accepted by the actuarial science community.

### iv.    Testability

Relatedly, Liberty Mutual's arguments regarding Schwartz's level of detail raise issues with regard to the testability of Schwartz's methodology. Specifically, Liberty Mutual asserts that Schwartz's "barebones framework" and "generalizations" do not provide sufficient detail regarding "*how* he intends to do this analysis, what factors to consider, at what percentages and over what periods of time, and with what coverages[.]" (Doc. No. 102-1 at 19–20.) Liberty Mutual argues that Schwartz "offers a litany" or "laundry list" of "factors that he might consider" without explaining how he is going to "use" or "weigh" those "inputs to arrive at a final figure." (Doc. No. 126 at 6, 10.)

In opposition, Plaintiff argues that the lack of "an exact formula where each of a set of data points plug in in to mathematically generate a figure for reasonable premium relief is not a basis for the court to exclude his testimony as unreliable." (Doc. No. 116-2 at 21.) Rather, Plaintiff asserts that Schwartz's declaration is "sufficiently detailed for this stage of the proceedings" because it provides:

the types of information that [Schwartz] will use (e.g., claim frequency, claims

12

severity, pure premiums, and loss ratios) from Liberty Mutual's records (documents filed with the CDI, claim reports, reserving analyses, trend data, and submissions by Liberty to the CDI dealing with COVID-19) to determine the impact of the pandemic on Liberty Mutual's insurance costs and the amounts that should have been returned to the class members.

(*Id.* at 14–15.)

The testability factor questions "whether an expert's methodology can be 'challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). "Testability assures the opponent of proffered evidence the possibility of meaningful cross-examination (should he or someone else undertake the testing)." *Id.* (citation omitted). "Where an expert's proposed method is novel or untested, it makes sense to demand a greater degree of specificity and completeness before it is relied upon to certify a class." *Lytle*, 114 F.4th at 1033.

Without identifying an exhaustive list of factors and providing a clear, specific explanation of how he will "evaluate" or "consider" those factors, Schwartz has not provided the Court with sufficient information to determine that his methodology would be testable or otherwise objectively challengeable. Although more specificity is not always necessary at this stage of proceedings, in this case where Plaintiff is proffering a method for calculating class-wide damages that is untested and lacks other *Daubert* factors of reliability, the Court requires a greater degree of specificity and completeness than Schwartz provided for this factor to weigh in favor of reliability.

### v.     Acceptance by Other Courts

Plaintiff asserts that Schwartz's methodology is not novel because (1) he has done similar analyses for courts previously and (2) his methodology was accepted in other COVID-19 relief premium cases. (Doc. No. 116-2 at 16–17, 19–20.) Regarding the first point, Plaintiff argues that he has performed analysis of "insurance company experience and trends in that experience" in different contexts "dozens of times" in California. (*Id.* at

19.) Plaintiff follows up this assertion with two out-of-state examples: one regarding misapplication of a rating plan by the Ohio Bureau of Workers Compensation and one regarding overcharging of homeowner insurance policyholders in Texas. (*Id.* at 19–20.) In the Ohio case, Plaintiff states that Schwartz's analysis of the impact of misapplication of a rating plan by the Ohio Bureau of Workers Compensation was found "appropriate" by the trial and appellate courts of Ohio. (*Id.*) Finally, Plaintiff details a case where a district court in Minnesota accepted Schwartz's report that class-wide damages could be determined using a common factor that he had yet to calculate. (*Id.* at 17 (explaining *Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, 577 F. Supp. 3d 970 (D. Minn. 2021)).)

Because the cases provided by Plaintiff involve different areas of insurance, different states and therefore different laws, different factual circumstances, and different exact formulas, these cases do not support the reliability of the methodology at issue in the instant case.[3] These experiences would, instead, lend credence to Schwartz's qualifications to testify as an expert in insurance actuarial science.[4]

Second, the parties disagree over whether the acceptance of similar reports in other COVID-19 cases supports the reliability of Schwartz's methodology in the instant case. Specifically, the parties each rely on a COVID-19 insurance refund case from the Northern District of California in which Schwartz offered a very similar report to support class certification. (*Compare* Doc. No. 116-2 at 16–18 (analyzing *Day*, 2022 WL 16556802) *with* Doc. Nos. 102-1 at 6–7, 16 *and* 126 at 10, 14–15.)

In *Day*, the plaintiff claimed the GEICO Casualty, General Insurance, and Indemnity Companies violated the UCL by providing insufficient refunds considering the excess profits it reaped during the COVID-19 crisis. *Day*, 2022 WL 16556802, at *1. Schwartz

---

[3]   Moreover, Watkins asserts, and Schwartz does not rebut, that "the Texas Commissioner ultimately rejected Mr. Schwartz's proposed refund methodology[.]" (*Compare* Watkins Report ¶ 114 *with* Schwartz Rebuttal Decl.)

[4]   Schwartz's qualifications are not at issue as Liberty Mutual does not challenge Schwartz on this ground and the Court finds Schwartz qualified to testify on these issues.

presented the same damages model and similarly failed to provide a formula for the value of B, simply stating that "he will calculate the value of B based on GEICO's records, including 'claim frequency, claim severity, pure premiums and loss ratios.'" *Id.* at *3. The court found Schwartz's methodology sufficient at the class certification stage because he had "identif[ied] what data sources he would consider, as well as how the percentage would be used and how it would apply on a class[-]wide basis," and because "some of the information required to further develop the model [wa]s in GEICO's hands." *Id.* at *4. Although the general circumstances are similar and Schwartz's damages model is ostensibly the same, the Court finds Plaintiff's reliance on *Day* unpersuasive because the *Day* court did not expressly analyze any of the *Daubert* factors when ruling on GEICO's Rule 702 motion to exclude at the class certification stage.

Liberty Mutual argues the Court should consider the transcript of the *Day* court's subsequent decertification and *Daubert* hearings. (Doc. Nos. 102-1 at 6–7, 16; 126 at 10, 14–15.) However, as noted by Plaintiff (Doc. No. 116-2 at 16 n.2), the *Day* court never ruled on the *Daubert* motion. Considering the differences between the instant case and that of *Day*, and that no ruling was issued on the *Daubert* motion, the Court finds the *Day* transcript to not be persuasive either.

Finally, although not addressed by Plaintiff, Liberty Mutual argues that this Court's order granting certification in *Chavez v. Allstate Northbrook Indemnity Co.*, No. 22-CV-00166-AJB-MMP, 2024 WL 3550394 (S.D. Cal. June 25, 2024), should not support a finding of reliability in the instant case. (Doc. No. 102-1 at 6–7.) In *Chavez*, the plaintiff brought the same claim against Allstate as is brought here against Liberty Mutual— violation of the implied covenant of good faith and fair dealing by not providing sufficient refunds during the COVID-19 crisis. *Chavez*, 2024 WL 3550394, at *1–*2. In *Chavez*, this Court certified the class, finding the commonality requirement satisfied based on a similar declaration and methodology from Schwartz. *Id.* at *4–*5. However, Schwartz's report in *Chavez* was not contested by Allstate, so the Court did not perform a *Daubert* analysis. The Court does not find its previous reliance on a similar declaration by Schwartz in a

different action to be persuasive in the instant case because the report in *Chavez* was not subject to analysis regarding its reliability.

### vi.    Conclusion

Plaintiff, as the party proffering Schwartz's testimony, bears the burden of demonstrating its reliability by a preponderance of the evidence. *See* Fed. R. Evid. 702; *see also Cooper*, 510 F.3d at 942. Although the *Daubert* inquiry is a flexible one, *Daubert*, 509 U.S. at 594, flexibility does not vitiate Plaintiff's burden. *Cf. Lytle*, 114 F.4th at 1033 ("Where an expert's proposed method is novel or untested, it makes sense to demand a greater degree of specificity and completeness before it is relied upon to certify a class."). Schwartz's failure to provide either a formula for or sufficient explanation of how the "B-factor" will be derived turns his entire methodology into an impermissibly inscrutable black box. *See GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *4–*5 (N.D. Cal. Apr. 16, 2014) (rejecting an expert's methodology as "a black box into which data is fed . . . and an answer emerges" because "'30 years of experience' does not constitute 'sufficient facts or data,' or 'reliable principles and methods[,]' . . . [it] cannot be tested or 'subjected to peer review and publication,' nor [wa]s there a 'known or potential rate of error'"). Where no "understandable scientific basis is stated," the Court's concern becomes that "[p]ersonal opinion, not science, is testifying here." *Daubert II*, 43 F.3d at 1319 (citation omitted). As such, the Court finds that Plaintiff has failed to demonstrate sufficient indicia of reliability for Schwartz's opinion to be admitted.

### 2.    Relevance

Second, Liberty Mutual argues that Schwartz's methodology is not relevant because it does not fit Plaintiff's theory of liability and is not helpful to the trier of fact. (Doc. No. 102-1 at 23–30.) Plaintiff opposes both arguments.

### i.    Fit

Liberty Mutual asserts that Schwartz's methodology is not relevant because it is not consistent with Plaintiff's theory of liability. (Doc. No. 102-1 at 28–30.) Specifically, Liberty Mutual argues that Schwartz's method for calculating damages does not consider—

but should have considered—the putative class members' reasonable expectations as the remaining claim is that Liberty Mutual breached implied covenant of good faith and fair dealing. (*Id.* at 29.)

Plaintiff counters that the "reasonable relief" Schwartz's methodology will determine is the "appropriate adjustments" that the putative class members' expected Liberty Mutual to have made in its discretion during the changed circumstances. (Doc. No. 116-2 at 30.)

Under the relevance or "fit" prong, the testimony must be "'relevant to the task at hand,' i.e., that it logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315 (quoting *Daubert*, 509 U.S. at 597). A damages model that is "untethered from [a] plaintiff's theory of liability such that it has no possibility of demonstrating the amount of damages in a particular case," *Lytle*, 114 F.4th at 1027, would not "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a).

There is sufficient logical connection between Plaintiff's theory of liability and Schwartz's opinion to meet the low threshold for relevance. Liberty Mutual's disagreements with the metrics Schwartz considers in his calculation would go to the weight of his opinion, not its admissibility.

### ii. Helpfulness

Liberty Mutual further argues that Schwartz's opinion and methodology would be confusing, misleading and unhelpful because it "would unlawfully require Liberty Mutual to diverge from charging prior approved rates." (Doc. No. 102-1 at 23–25.) In support of this argument, Liberty Mutual and its expert set forth the statutory framework for how personal automobile insurance carriers are permitted to set rates. (*Id.*) In opposition, Plaintiff asserts that these arguments are an attempt by Liberty Mutual to reargue its motion to dismiss and judgment on the pleadings. (Doc. No. 116-2 at 26–29.)

As previously determined by this Court, Plaintiff's claims are not barred by law. (*See e.g.*, Doc. Nos. 38, 74.) Moreover, as Plaintiff notes, the CDI authorized insurers to

provide premium refunds without prior approval. (Doc. Nos. 116-2 at 24; 115-4 at 3.) As such, the Court finds Liberty Mutual's arguments that the methodology would be "unlawful" or "counterfactual" fail.

### iii.    Conclusion

Considering and finding unpersuasive Liberty Mutual's arguments regarding fit and helpfulness, the Court finds that Schwartz's opinion is relevant as required by Rule 702 and *Daubert*.

### 3.    Additional Arguments

Finally, Liberty Mutual asserts two additional arguments, neither of which the Court finds to be bases to exclude Schwartz's opinion.

### i.    Opining on the Ultimate Issue

Liberty Mutual argues that Schwartz's opinion should be excluded because he "impermissibly opines as to an ultimate issue," namely "how to interpret the CDI Settlement," how to interpret "the CDI Bulletins," "what rates CDI should have set or adjusted for Liberty Mutual," and "what Liberty Mutual paid was inadequate under an implied covenant claim analysis." (Doc. No. 102-1 at 26–27.) Liberty Mutual also takes issue that Schwartz issues this "impermissibl[e] opinion on the ultimate issue" without having performed an analysis of the CDI's premium relief calculation yet. (*Id.*)

Plaintiff counters that not only will Schwartz not be telling the Court how to interpret the CDI settlement or what rates the CDI should have set, such analysis has already been done by the Court when it denied Liberty Mutual's motion for judgment on the pleadings. (Doc. No. 116-2 at 26, 28.) To the extent Liberty Mutual is arguing that the settlement constituted "adequate premium relief," Plaintiff argues that "Schwartz is qualified to make an actuarial assessment of that conclusion." (*Id.* at 28.)

As a threshold matter, pursuant to Rule 704, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). However, the Court is not persuaded that Schwartz opines on the ultimate legal issue of whether Liberty Mutual's COVID-19 premium refunds breached the implied covenant of good faith and fair dealing.

Although fine, there is a distinction between whether the refunds were adequate from an insurance actuarial standpoint and whether the refunds breached the putative class members' reasonable expectations.

Finally, Liberty Mutual's focus on the CDI settlement, rates set by the CDI, or Liberty Mutual's compliance with the CDI's COVID-19 refund requirements all appear to stem from an idea that such compliance *is* the reasonable expectation of policyholders. These arguments go to the weight of the competing experts' opinions at this stage, not whether Schwartz's opinion lacks reliability or relevance.

### ii.    Arbitrariness of Selected Time Period

In her motion for class certification, Plaintiff seeks to amend the class period to run from March 1, 2020, to June 11, 2021, based on Schwartz's analysis. (Doc. No. 84 at 15 n.3.) Liberty Mutual attacks Schwartz's analysis as "arbitrar[y]" because the impact of the COVID-19 crisis on carrier losses continued beyond June 2021. (Doc. No. 102-1 at 20–23.) Plaintiff counters that Schwartz's report explains why, from an actuarial standpoint, the class period is both reasonable and appropriate. (Doc. No. 116-2 at 25–26.)

In his initial declaration, Schwartz provides three reasons for selecting June 11, 2021, as the end date for the class period: (1) the lifting of the state-wide stay-at-home orders, (2) a near return in miles driven to pre-COVID levels, and (3) the shift of loss ratios for California private passenger automobile insurance from being lower to being higher than pre-COVID levels. (Schwartz Decl. ¶¶ 19–22.)

Although Liberty Mutual disagrees with Plaintiff's selected class period and proffers a different end date based on its own expert's opinion, the Court finds these disagreements go to the weight of the competing expert opinions, not the issue of whether Schwartz's opinion lacks reliability or relevance.

### D.    Conclusion

In sum, the Court finds Schwartz's testimony relevant, but Plaintiff fails to establish that Schwartz's methodology has any indicia of reliability sufficient to pass the gatekeeping threshold of *Daubert* and Rule 702. Accordingly, the Court **GRANTS** Liberty

Mutual's motion to exclude Schwartz's report.

## III.    PLAINTIFF'S MOTION TO CERTIFY CLASS

Having granted Liberty Mutual's motion to exclude, the Court next turns to Plaintiff's motion for class certification, which the Court will analyze without reliance on or consideration of arguments based on Schwartz's methodology.

### A.    Legal Standard

Class actions are the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To depart from this rule, the "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citation and internal quotation marks omitted). The proponent of class treatment, usually the plaintiff, bears the burden of demonstrating the propriety of class certification. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014). This burden requires the plaintiff to provide sufficient facts to satisfy the four requirements of Rule 23(a) and at least one subsection of Rule 23(b) of the Federal Rules of Civil Procedure.[5] *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

Under Rule 23(a), a case is appropriate for certification as a class action if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "The Rule's four requirements—numerosity, commonality, typicality, and adequate representation— 'effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (*General Tel. Co. v.*

---

[5]    All further references to Rule or Rules are to the Federal Rules of Civil Procedure unless otherwise stated.

*Falcon*, 457 U.S. 147, 156 (1982)). "If the court finds the action meets the requirements of Rule 23(a), the court then considers whether the class is maintainable under Rule 23(b)." *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 451 (S.D. Cal. 2014).

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Relevant here, pursuant to Rule 23(b)(3), "[a] class action may be maintained if Rule 23(a) is satisfied and if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

When entertaining a class certification motion, the court is obligated to conduct a rigorous analysis of whether the requirements of Rule 23 are satisfied. *Falcon*, 457 U.S. at 161. While the court must not go on a freewheeling inquiry into the merits of the plaintiff's claims, "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Dukes*, 564 U.S. at 351 (quoting *Falcon*, 457 U.S. at 160). Accordingly, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). The court must therefore limit its inquiry "to those aspects relevant to making the certification decision on an informed basis." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 499 (S.D. Cal. 2013).

## B.    Proposed Class Definition

Plaintiff seeks to certify the following class:

> All California residents who purchased personal automobile insurance from Liberty Mutual covering any portion of the time period from March 1, 2020 to June 11, 2021.

(Doc. No. 84 at 15.) Plaintiff notes the FAC includes a class period running through "the

present." (*Id.* at 15 n.3 (quoting FAC ¶ 44).) Plaintiff states she "now believes expert analysis will indicate an earlier end date, consistent with when Governor Newsom lifted the stay-at-home restrictions on June 11, 2021." (*Id.*)

District courts have the inherent power to modify class definitions. *See Mazur v. eBay Inc.*, 257 F.R.D. 563, 568 (N.D. Cal. 2009) (citing *Hagen v. City of Winnemucca*, 108 F.R.D. 61, 64 (D. Nev. 1985)); *see also Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("[D]istrict courts have broad discretion to modify class definitions . . . ."); *Schorsch v. Hewlett–Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005) (noting that "[l]itigants and judges regularly modify class definitions"). Using this discretion, the Court **MODIFIES** the class period as stated by Plaintiff in her motion for class certification, using June 11, 2021 as the end date for her claims. This modification is to remain consistent with Governor Newsom's stay-at-home restrictions, which ended on June 11, 2021.

Plaintiff also moves the Court for an order: (1) appointing Plaintiff Sarah Blain as class representative; and (2) appointing Nichols Kaster, PLLP, Stephan Zouras, LLP, and Manfred, APC as class counsel. (*See generally* Doc. No. 84.)

### C.    Rule 23(a) Prerequisites

The Court will first start with an analysis of whether Plaintiff has satisfied the Rule 23(a) elements of numerosity, commonality, typicality, and adequacy.[6]

### 1.    Numerosity

First, the numerosity requirement is satisfied where "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[I]mpracticability does not mean impossibility,

---

[6]    The Ninth Circuit does not require courts to apply ascertainability as an independent threshold requirement to class certification, and the parties do not address it in their briefs. *See True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 929 (9th Cir. 2018) ("We held that there is no free-standing requirement above and beyond the requirements specifically articulated in Rule 23.") (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 n.4 (9th Cir. 2017) ("[Defendant-Appellant] cites no other precedent to support the notion that our court has adopted an 'ascertainability' requirement. This is not surprising because we have not.")).

but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964) (citation omitted).

Here, Plaintiff asserts the class is sufficiently numerous because the proposed class contains over 190,000 members. (Doc. No. 84 at 16.) Liberty Mutual does not contest this element. (*See generally* Doc. No. 94.) Accordingly, the Court finds this requirement has been satisfied. *See Lessin v. Ford Motor Co.*, No. 19-CV-01082-AJB-AHG, 2024 WL 4713898, at *24 (S.D. Cal. Nov. 7, 2024).

### 2.    Commonality

The commonality factor "requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 157). The "claims must depend on a common contention" and that common contention must be "of such a nature that it is capable of classwide resolution[.]" *Id.* The commonality requirement of Rule 23(a)(2) is construed less rigorously, for example, than the "predominance" requirement of Rule 23(b)(3). *Id.* Indeed, for purposes of Rule 23(a)(2), even a single common question will suffice. *Id.* at 359. A plaintiff need not show commonality across a class with regard to all questions of law or fact. *See Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013); *see also Falco v. Nissan N. Am. Inc.*, No. CV 13-00686 DDP, 2016 WL 1327474, at *4 (C.D. Cal. Apr. 5, 2016). Rather, a plaintiff meets the requirements of Rule 23(a)(2) by showing that the class has in common "a single significant issue of law or fact." *Abdullah*, 731 F.3d at 957 (internal quotation marks omitted).

Plaintiff asserts commonality is satisfied because there is a common question of "whether Liberty Mutual unfairly interfered with the rights of its policyholders by failing to make appropriate adjustments due to the changed circumstances of the pandemic." (Doc. No. 84 at 18.) Plaintiff further contends the answer to this question can be decided at trial through common, class-wide proof. (*Id.*) Moreover, she asserts there is no need for inquiry into individual circumstances because Liberty Mutual concedes its California personal

automobile policies are governed by the same standard of contract. (*Id.* at 19–20.) She also points to common evidence to prove this claim, including proof that Liberty Mutual recognized the need to provide premium relief because of reduced driving and risk during the COVID-19 pandemic; evidence of the standardized parameters of Liberty Mutual's premium refund program, including which customers would receive premium relief, how much would be provided, and over what period of time; common proof of the application of these parameters to putative class members, which was done on a uniform basis, with no individualized considerations of policy coverages, driving habits, or any other factor; and the expert witness testimony of Schwartz concerning the insufficiency of Liberty Mutual's refund program to remedy the excessive premiums paid in light of the COVID-19 pandemic and the amount of relief owed to class members. (*Id.* at 18–19.)

In opposition, Liberty Mutual argues that Plaintiff relies on the "CHANGES" Policy provision as the source of its discretion to adjust premiums not as the source of the breach and thus liability. (Doc. No 94 at 30–31.) As such, Plaintiff's common question is not "liability-determinative" because it does not consider the putative class members' "reasonable expectations." (*Id.*) Liberty Mutual asserts that the question of whether it breached a putative class member's reasonable expectations necessarily requires consideration of "the myriad of individualized circumstances" behind "each insured's unique perspective and expectation." (*Id.* at 31–32.)

Plaintiff replies that the reasonable expectation shared by the putative class is that "premiums would accurately reflect the risk that Liberty Mutual faced, and that the company would not obtain an unfair windfall," which was breached when Liberty Mutual failed to "adequately adjust premiums in response to the drastic decrease in risk from the COVID-19 pandemic." (Doc. No. 114 at 15.)

Although Liberty Mutual attempts to recast Plaintiff's theory of liability, based on a review of the operative complaint and the instant briefing, the Court is satisfied that the common question proffered by Plaintiff goes to liability and is common to all class members.

The cases proffered by Liberty Mutual are distinguishable from the instant action. First, *Consolidate Fiberglass Products Company* involved a dispute over whether a specific provision in the defendant's standard general comprehensive liability policy made the plaintiff responsible for a deductible that included litigation costs. *Consolidate Fiberglass Prods. Co. v. Gemini Ins. Co.*, No. 09-CV-1632-H (WMC), 2011 WL 13180451, *1, *3 (S.D. Cal. Feb. 4, 2011). There, the court declined certification because, although the plaintiffs all purchased a standardized *policy* with standardized language, inquiry into each plaintiff's individual *contract* was required because the *contract* itself was ambiguous about application of the policy. *Id.* at *3–*4. Here, Plaintiff relies on a single standard policy provision for the proposition that Liberty Mutual had discretion to adjust rates. No competing documentation is implicated, let alone competing documentation that differentiates and individualizes treatment of putative class members.

Second, in *Parducci*, the plaintiff brought several claims including breach of the implied covenant of good faith and fair dealing against a homeowners' insurer for a scheme of purposefully overcharging policyholders by intentionally overestimating the replacement cost of their homes. *Parducci v. AMCO Ins. Co.*, No. 18-CV-07162-WHO, 2021 WL 5908379, at *1, *4 (N.D. Cal. Dec. 14, 2021). There, the court denied class certification because "[a]ny determination of liability would require individual assessments of (1) the value of each class member's home to determine whether it was in fact overinsured beyond its 'true value;' and (2) the value that each class member placed on her coverage." *Id.* at *7. Much like with *Consolidate Fiberglass*, Liberty Mutual analogizes the instant action to *Parducci* by arguing that "[e]ach policyholder will have a 'unique perspective' on the amount of premium he or she expected to pay." (Doc. No. 94 at 32.) Although the actual premiums that each putative class member pays monthly may differ based on the applicable rating factors, the theory of liability in this case is tied to the alleged inadequacy of Liberty Mutual's uniformly applied percent refund. Thus, unlike *Parducci*, Plaintiff has sufficiently demonstrated at this stage that individual assessments of a putative class member's experience would not be necessary to determine liability.

Rather, the instant case is more similar to *Chavez* where the plaintiff brought a claim alleging Allstate Northbrook Indemnity Company violated the implied covenant of good faith and fair dealing by failing to make sufficient adjustments to premiums based on the changed circumstances of the COVID-19 crisis. *Chavez*, 2024 WL 3550394, at *1–*2. There, this Court found that, because the plaintiff's claim "challenge[d] the base automobile insurance rate," which the plaintiff asserted was "the same for and applied uniformly to all policyholders," it did not matter that any given policyholder paid a different premium due to the different applicability of rating factors. *Id.* at *5. Moreover, this Court found important that Allstate had applied its allegedly inadequate premium relief "uniformly as a percentage of each customer's monthly payments and the amount did not differ based on the individual circumstances of each policyholder." *Id.* (cleaned up). For those reasons, this Court found the plaintiff had satisfied the commonality requirement. *Id.* The instant circumstances and arguments regarding commonality are nearly identical to those of *Chavez*.

Considering the parties' arguments and relevant case law, the Court finds Rule 23(a)(2) satisfied.

### 3. Typicality

Rule 23(a)(3)'s typicality requirement provides that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156 (quoting *E. Tex. Motor Freight Sys.*, 431 U.S. at 403) (internal quotation marks omitted); *see also Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) ("[T]ypicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.") (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). The purpose of the requirement is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508. "[T]he typicality requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Rodriguez v. Hayes*, 591 F.3d 1105,

1124 (9th Cir. 2010) (internal citations omitted). However, a court should not certify a class if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508 (internal quotation marks and citation omitted).

Plaintiff asserts typicality is satisfied because she and the putative class members suffered the same injury arising from the same course of conduct by Liberty Mutual, resulting in the same claim for breach of the implied covenant of good faith and fair dealing. (Doc. No. 84 at 20.)

Liberty Mutual counters that Plaintiff is not typical because (1) "the 'course of conduct' differs overwhelmingly for each putative class member," and (2) "[Plaintiff]'s individual circumstances are dispositively unique." (Doc. No. 94 at 36.) As to the second argument, Liberty Mutual specifically asserts that Plaintiff "testified that she was not harmed by anything Liberty Mutual did," "that she had no expectations regarding the profit the Library Mutual would make as to her Policy," and that "she was satisfied with the premium reductions she was receiving[.]" (*Id.*) Liberty Mutual also asserts that Plaintiff's mileage increased in April 2021. (*Id.* at 37.) Finally, Liberty Mutual points to Plaintiff's "repeated[] interact[ions] with Liberty Mutual customer service representatives to discuss her individual mileage and PPA coverage" as making Plaintiff's individual expectations atypical. (*Id.* at 37–38.) As such, Liberty Mutual argues there is a substantial risk that Plaintiff's own reasonable expectations would consume the litigation. (*Id.* at 38.)

In reply, Plaintiff first asserts that Liberty Mutual "cherry-pick[s] from [Plaintiff]'s deposition," and thus its curated statements are "entitled to little weight." (Doc. No. 114 at 17.) Plaintiff also reiterates that she and the rest of the putative class share the same "reasonable expectations." (Doc. No. 114 at 20.) Moreover, Plaintiff asserts that her claims "are based upon the drastic reduction in aggregate risk during the COVID-19 pandemic." (Doc. No. 114 at 18.) Plaintiff's explanation in support of this argument, though detailed, is not considered as it is based on the excluded Schwartz testimony. (*See* Doc. No. 114 at 18–20.)

Regarding the first point in opposition, the Court notes Liberty Mutual fails to provide any context or explanation for its "course of conduct" reference. To the extent Liberty Mutual is referencing its previous arguments asserting the reasonable expectations are individualized based on each putative class member's specific premium, the Court addressed and found unpersuasive those arguments *supra* § III.C.2. Also, Liberty Mutual asserts that Plaintiff did not alert it to changes in her premium-based information; however, Liberty Mutual fails to explain how this makes Plaintiff atypical or why this is otherwise relevant to the present inquiry.

Second, having reviewed Plaintiff's deposition testimony, although some statement cited by Liberty Mutual gave the Court pause, Plaintiff additionally testified repeatedly to Liberty Mutual providing her an inadequate refund based on an aggregate decrease in miles driven during the COVID-19 crisis. These statements are sufficient to demonstrate that Plaintiff's claim is reasonably co-extensive with that of the class. *See Rodriguez*, 591 F.3d at 1124; *see also Chavez*, 2024 WL 3550394, at *5.

Third, the Court cannot identify any danger putative class members would face by allowing Plaintiff to represent them in this claim as Liberty Mutual's arguments against Plaintiff—that individualized inquiry and proof is required for both liability and damages—are applied equally to the entire putative class throughout the motion. Rather, Plaintiff has sufficiently demonstrated that "the nature of [her] claim" is typical. *See Parsons*, 754 F.3d at 685.

Considering the permissive nature of Rule 23(a)(3), the Court finds Plaintiff's injuries are "reasonably co-extensive with those of absent class members" such that her claim, injury, and interest are typical of the class and, as such, Plaintiff has satisfied the typicality requirement. *See Rodriguez*, 591 F.3d at 1124.

### 4. Adequacy

Rule 23(a)(4) requires the class representative to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether the representation meets this standard, we ask two questions: (1) Do the representative plaintiffs and their

28

counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). "Adequacy of representation also depends on the qualifications of counsel." *Sali*, 909 F.3d at 1007. Specifically, "[t]he named representative's attorney must be qualified, experienced, and generally capable to conduct the litigation." *Id.* (quoting *Jordan v. L.A. Cty.*, 669 F.2d 1311, 1323 (9th Cir. 1982)) (cleaned up).

Plaintiff asserts she "has no interests antagonistic to the class," has "shown her commitment to vigorously prosecuting the litigation," and "has been actively involved in her case." (Doc. No. 84 at 21.) For instance, Plaintiff provided relevant information and documents, reviewed the complaint, sat for her deposition, and attended a settlement conference with Liberty Mutual and the Court. (*Id.*) Additionally, counsel assert they will fairly and adequately represent the class as they have done thus far. (*Id.* at 21–22.) In support of these assertions, class counsel proffered declarations from the three firms representing Plaintiff detailing action taken litigating this case and declaring no known conflicts. (*See* Doc. Nos. 84-1; 84-2; 84-3.)

Although Liberty Mutual challenges Plaintiff's adequacy as the class representative, it does so by merely reiterating the arguments made challenging typicality (*see* Doc. No. 94 at 36–38), which the Court addressed immediately *supra*.

Based on these assertions, the Court is satisfied that Plaintiff's interests align with those of the proposed class members, counsel has no conflicts, and that both Plaintiff and counsel have and will continue to vigorously prosecute the action on behalf of the putative class. Thus, the Court finds Plaintiff has demonstrated the adequacy requirement of Rule 23(a)(4).

### 5. Conclusion

Based on the foregoing, the Court finds that Plaintiff has sufficiently met each of the requirements set forth in Rule 23(a).

///

### D.    Rule 23(b)(3) Requirements

A class may be certified pursuant to Rule 23(b)(3) if the district court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009).

### 1.    Predominance

"The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)); *see also Vinole*, 571 F.3d at 944 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)) ("The predominance inquiry focuses on 'the relationship between the common and individual issues' and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'").

Plaintiff asserts "[t]here will be few, if any, individualized questions, as each class member challenges the same alleged unlawful conduct," and that "[c]ommon questions also predominate with respect to the requested relief." (Doc. No. 84 at 23–24.) However, Plaintiff's assertions are based in large part on use of Schwartz's methodology to calculate class-wide damages.

In opposition, Liberty Mutual offers several distinct bases as to why Plaintiff cannot satisfy the predominance requirement, all of which pertain to damages calculations and most of which center on deficiencies in Schwartz's methodology for calculating class-wide damages. (Doc. No. 94 at 16–30.) In addition to arguments that Plaintiff fails to proffer a viable damages model (*id.* at 16–20, 25–28), Liberty Mutual also asserts that (1) ascertaining the existence of damages requires individual inquiry (*id.* at 20–25); (2) a "great number" of putative class members were uninjured (*id.* at 29–30); and (3) it has a "due process right to argue and present individualized counterevidence for each

individual policyholder" (*id.* at 28–29 (citing *Van v. LLR, Inc.*, 61 F.4th 1053, 1067 (9th Cir. 2023)).).

"[D]amage calculations alone cannot defeat certification," because "the amount of damages is invariably an individual question and does not defeat class action treatment." *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) (citation omitted). "Thus, the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). However, "the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Id.* (citing *Comcast Corp.*, 569 U.S. at 38). "If the plaintiff does not offer a plausible damages model that matches her theory of liability, the problem is not just that the Court will have to look into individual situations to determine the appropriate measure of damages; it is that Plaintiffs have not even told the Court what data it should look for." *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 697 (N.D. Cal. 2021) (quoting *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1103 (N.D. Cal. 2018)).

For the reasons explained *supra* § II.C.2, Schwartz's model for assessing damages is not admissible under *Daubert* and Federal Rule of Evidence 702. The impediment to certification here is not that damages need to be individualized—nor is the Court making a determination of that purported need—but that Plaintiff has not put forward a damages model that can reliably calculate the reasonable percent refund. Specifically, excluding Schwartz's report, Plaintiff has failed to sufficiently demonstrate that calculation of a reasonable percent refund is possible. Moreover, as it is Plaintiff's burden to demonstrate the propriety of class certification, with the exclusion of arguments relying on Schwartz's reports, Plaintiff has not sufficiently demonstrated that "[q]uestions of individual damage calculations will [not] inevitably overwhelm questions common to the class." *See Comcast Corp.*, 569 U.S. at 34. Because Plaintiff has made neither a sufficient showing that damages can be accurately calculated nor sufficiently demonstrated individual questions of damages for 190,000 putative class members will not overwhelm the common question of liability,

the Court **DENIES without prejudice** Plaintiff's motion for class certification on the basis of Rule 23(b)(3). *See, e.g.*, *Zeiger*, 526 F. Supp. 3d at 697.

### 2. Superiority

Despite finding Plaintiff's motion fails the predominance prong, the Court continues its analysis of Rule 23(b)(3) for completeness, considering leave to file a renewed motion for class certification has been granted.

If a court finds that the proposed class satisfies the predominance requirement of Rule 23(b)(3), the court must also determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3). To determine superiority, courts consider (1) the interest of class members individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability of concentrating the litigation of the claims in this particular forum; and (4) the manageability of the action as a class. Fed. R. Civ. P. 23(b)(3)(A)–(D). Consistent with the aim of the Federal Rules of Civil Procedure to promote judicial economy, a class action is the superior method for resolution "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency[.]" *Valentino v. Cartier-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

Plaintiff maintains that a class action is a superior method of adjudicating putative class members' claims against Liberty Mutual. (Doc. No. 84 at 25.) She asserts that "[a]ny interest by class members in controlling the prosecution of their individual claims is far outweighed by the efficiency in adjudicating the claims as a class action." (*Id.*) Moreover, Plaintiff states that counsel is not aware of other litigation in California that has already begun on behalf of the putative class and that there is no dispute that the Southern District of California is the appropriate forum for trial. (*Id.*) Finally, Plaintiff asserts the class claims can be managed in a single trial using common, class-wide proof with the same core of evidence. (*Id.*)

The entirety of Liberty Mutual's argument against superiority is that the CDI's

settlement with Liberty Mutual which "fully and finally reviewed Liberty Mutual's COVID-era performance and relief to PPA policyholders in 2023" is superior. (Doc. No. 94 at 32–36.) The extensive arguments provided by Liberty Mutual attempt to proffer the Settled Order as a bar to Plaintiff's claim, in essence relitigating issues the Court decided in the prior motion to dismiss and judgment on the pleadings. As discussed both in the Court's previous orders and *supra* § III.C.2.ii, the Court has determined, at this point, that Plaintiff's claims are not barred by the CDI or the California statutory scheme. To the extent Liberty Mutual's arguments are that the CDI settlement resulted in appropriate premium refunds such that Liberty Mutual did not violate the putative class members' reasonable expectations, those arguments are for the merits.

Considering the applicability of the four superiority factors and Liberty Mutual's lack of any argument contrary to these factors, the Court finds that a class action would be the superior method for resolving the claims Plaintiff alleges against Liberty Mutual, if Plaintiff had demonstrated predominance.

### E.    Rule 23(c)(4) Requirements

Plaintiff alternatively moves to certify the class pursuant to Rule 23(c)(4), and "requests that the Court bifurcate liability or other issues," asserting that "[a]t the very least, certification on the issue of liability is appropriate" on this ground. (Doc. No. 84 at 26.)

"Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues." *Valentino*, 97 F.3d at 1234. Certification pursuant to Rule 23(c)(4) is appropriate where "adjudication of the certified issues would significantly advance the resolution of the underlying case, thereby achieving judicial economy and efficiency." *Id.* at 1229; *see also Rahman v. Mott's LLP*, 693 F. App'x 578, 579 (9th Cir. 2017) (unpublished) ("Certification of an issues class under Rule 23(c)(4) is 'appropriate' only if it 'materially advances the disposition of the litigation as a whole.'")

(quoting William B. Rubenstein, 2 Newberg on Class Actions 4:90 (5th ed. 2012)).

Plaintiff's cursory request for Rule 23(c)(4) certification is not sufficient. Plaintiff does not explain why an issues class would significantly advance the resolution of the putative class, despite bearing the burden to do so. Accordingly, the Court **DENIES without prejudice** Plaintiff's motion for certification on the basis of Rule 23(c)(4). *See Schneider v. YouTube, LLC*, 674 F. Supp. 3d 704, 727 (N.D. Cal. 2023) ("[The plaintiffs] appear to regard it as something of a consolation prize in the event certification is denied under Rule 23(b)(3). That is not the case.").

### E. Conclusion

Based on the reasons stated above, the Court **DENIES without prejudice** Plaintiff's motion for failing to proffer a reliable damages model or otherwise sufficiently demonstrate the predominance necessary for certification pursuant to Rule 23(b)(3) and failing to demonstrate the propriety of certification under Rule 23(c)(4).

## IV. REQUEST FOR JUDICIAL NOTICE

Liberty Mutual requests the Court take judicial notice of the hearing transcript on GEICO's motion to decertify the class in *Day* that it filed as an exhibit in support of its motion to exclude. (Doc. Nos. 102-5 (request for judicial notice); 102-6 (*Day* transcript).)

A court may take judicial notice of court filings. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). "However, while the authenticity and existence of a particular order, motion, pleading or judicial proceeding, which is a matter of public record, is judicially noticeable, veracity and validity of its contents are not." *Esparza v. Kohl's, Inc.*, 723 F. Supp. 3d 934, 940 (S.D. Cal. 2024) (internal punctuation and citation omitted).

Although the Court does not rely on the *Day* hearing transcript in reaching its conclusion on Liberty Mutual's motion to exclude, *see supra* § II.D, the Court **GRANTS** Liberty Mutual's request (Doc. No. 102-5) pursuant to Rule 201(c)(2) of the Federal Rules of Evidence and takes judicial notice of the *Day* transcript (Doc. No. 102-6) for the limited purpose of identifying that this document exists.

## V.    MOTION TO STAY

Turning to the final motion before the Court, Liberty Mutual seeks to stay this action pending the resolution of *Davis v. CSAA Ins. Exch.*, No. A169729, by the California Court of Appeal and/or of *Day v. GEICO*, No. 24-2201, by the Ninth Circuit. (*See generally* Doc. Nos. 133; 139.) Plaintiff opposes. (Doc. No. 138.)

### A.    Appellate Cases at Issue

#### 1.    *Davis* Action and Appeal

In *Davis*, the plaintiffs brought putative class claims against CSAA under the UCL, arguing the previously approved rates became excessive during the COVID-19 pandemic and CSAA did not return sufficient premiums. First Am. & Consol. Compl.,[7] *Davis v. CSAA Ins. Exch.*, No. 22cv014132 (Cal. Super. Ct. June 30, 2023), at ¶¶ 2–5, 19. Specifically, the plaintiffs alleged that

> as a result of state-wide social distancing and stay-at-home measures, driving and driving-related accidents decreased dramatically. The decrease in driving and accidents, in turn, significantly reduced the number of claims that auto insurers like CSAA paid. However, CSAA continued to charge its customers based on rates that had been approved long before the pandemic, resulting in a massive and unfair increase in CSAA's profits at the expense of its customers. . . . Despite full knowledge of these facts, CSAA continued to charge and collect excessive premiums throughout 2020 and 2021 during the course of the pandemic while failing to issue adequate refunds, contravening California law and public policy.

*Id.* at ¶¶ 2, 4. In affirming its tentative ruling and sustaining CSAA's demurrer, the superior court stated that, "[t]he 'unlawful application' argument has no application to this case where the [complaint] alleges that the DOI approved rates and then CSAA charged the

---

[7]    On March 15, 2023, the superior court consolidated two actions—one initiated by Joseph Davis on July 12, 2022, and a second initiated by Shavonda Early on August 3, 2022. Min. Order, *Davis v. CSAA Ins. Exch.*, No. 22CV014132 (Cal. Super. Ct. Mar. 15, 2023). Despite the superior court setting *Davis* as the lead case, Westlaw identifies the consolidated action by the name *Early v. CSAA Ins. Exch.*, No. 22CV014132. For accessibility, the Court uses Westlaw *Early* citations for orders by the *Davis* court where available.

approved rates," despite the changed circumstances. *Early v. CSAA Ins. Exch.*, No. 22CV014132, 2023 WL 7326094, at *1–*3 (Cal. Super. Ct. Nov. 03, 2023).

The plaintiffs appealed seeking a ruling on whether the pre-approved rates can become excessive because of unforeseen changed circumstances in violation of Proposition 103 and whether a claim based on such a theory can be brought under the UCL. (*See* Doc. Nos. 133-1 at 13; 138 at 11–12.)

The case was deemed fully briefed by the court on February 24, 2025.

### 2. *Day* Action and Appeal

As discussed briefly *supra* § II.C.1.v, the plaintiff in *Day* brought a class action UCL claim against GEICO arguing that the company "(1) fail[ed] to give an appropriate refund of premiums based on excess profit and an accurate risk assessment; (2) [gave] the refund only to customers who renewed their policies; (3) falsely claim[ed] that the Giveback [refund program] provided 'substantial and full relief'; and (4) fail[ed] to disclose its excessive profits." *Day*, 2022 WL 16556802, at *1.

On summary judgment, the court determined there was no genuine dispute of material fact because GEICO's evidence that the CDI's approval of the Giveback demonstrated its adequacy, while the evidence relied on by the plaintiff, namely Schwartz's expert report, was "not sufficiently probative" of the program's adequacy. *Day v. GEICO Cas. Co.*, No. 21-CV-02103-BLF, 2024 WL 1244481, at *8 (N.D. Cal. Mar. 21, 2024). In addressing Schwartz's report, the court opined the following:

> Plaintiff points to her expert's conclusion that COVID-19 pandemic relief should have totaled $733 million and that the Class should recover $238 million in restitution. Viewed in the light most favorable to Plaintiff, her expert's finding that the GEICO Giveback was inadequate to reasonably compensate the Class for reductions in claims during the COVID-19 pandemic is merely colorable and not sufficiently probative of the ultimate issue—whether GEICO's conduct violated the policy or spirit of the Insurance Code. In fact, Plaintiff's expert does not purport to determine whether the GEICO Giveback was adequate to protect consumers and ensure fair, available, and affordable insurance rates.

*Id.* (citations omitted). The court granted summary judgment in favor of GEICO, finding that the UCL claim failed as a matter of law. *Id.* at *9.

The plaintiff appealed, challenging the district court's reliance on the CDI's adequacy determination and assessment of Schwartz's report, among other aspects of the opinion. Pl.-Appellant's Opening Br., *Day v. GEICO*, No. 24-2201 (9th Cir. Aug. 23, 2024), Doc. No. 24.1 at 12–15. In response, GEICO attacks the methodology of Schwartz's report and asserts that Schwartz's report at most demonstrates damages as any connection from damages to liability would require a legal conclusion. Defs.-Appellees' Br., *Day v. GEICO*, No. 24-2201 (9th Cir. Oct. 23, 2024), Doc. No. 35.1, 34–39. Moreover, GEICO frames one of the issues as whether California's "prior approval" system for insurance rates "contemplate[s] or allow[s] rebates or refunds" where premiums were paid according to approved rates. *Id.* at 12. To that question, GEICO contends that the plaintiff's arguments would "upend the entire way insurance works." *Id.* at 46.

The case is fully briefed and is being considered for oral argument in July. *See* Pl.-Appellant's Reply, *Day v. GEICO*, No. 24-2201 (9th Cir. Jan. 10, 2025), Doc. No. 49; and Notice, *Day v. GEICO*, No. 24-2201 (9th Cir. Mar. 12, 2025), Doc. No. 62.

## B.    Legal Standard

"A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." *Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979). The Ninth Circuit has "identified three non-exclusive factors courts must weigh when deciding whether to issue a docket management stay: (1) the possible damage which may result from the granting of a stay; (2) the hardship or inequity which a party may suffer in being required to go forward; and (3) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law." *In re PG&E Corp. Sec. Litig.*, 100 F.4th 1076, 1085 (9th Cir. 2024) (quoting *Ernest Bock, LLC v. Steelman*, 76 F.4th 827, 842 (9th Cir. 2023)) (cleaned up). Although "[t]he District Court has broad discretion to stay proceedings as an

incident to its power to control its own docket," *Clinton v. Jones*, 520 U.S. 681, 706 (1997), "concern for . . . judicial efficiency[] 'standing alone is not necessarily a sufficient ground to stay proceedings,'" *In re PG&E Corp. Sec. Litig.*, 100 F.4th at 1085 (quoting *Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007)).

## C.    Analysis

### 1.    Judicial Efficiency

Liberty Mutual argues that "[a] stay of this case will promote the orderly course of justice because appellate decisions in *Davis* and *Day* are expected to be significant, and potentially binding, in the Court's evaluation of Liberty Mutual's forthcoming motion for summary judgment and could also potentially substantially narrow the issues for merits discovery in advance of that motion." (Doc. No. 133-1 at 19–26.) Specifically, Liberty Mutual argues that briefing in the *Day* appeal raises the issue of whether California's "prior approval system leaves no room for civil actions seeking refunds of premiums that were paid according to approved rates"—an issue that Liberty Mutual argued previously before this Court and intends to raise again on summary judgment. (Doc. Nos. 133-1 at 20; 139 at 7.)

Plaintiff counters that an indefinite stay, such as Liberty Mutual requests, is contrary to judicial economy. (Doc. No. 138 at 10–15.) Additionally, Plaintiff asserts that the *Day* and *Davis* appeals go to UCL claims and other case-specific issues that are inapplicable to the specific procedural posture and implied covenant of good faith and fair dealing claim at issue here. (*Id.*) Moreover, Plaintiff asserts that Liberty Mutual's "reasoning mirrors the multitude of claim preclusion arguments that have been repeatedly rejected by this Court." (*Id.* at 14.)

Although Plaintiff is correct in pointing out that this Court has ruled against Liberty Mutual's arguments previously, an appellate ruling determining, for example, that these factual circumstances permit a claim brought pursuant to the UCL or that pre-approved rates can become "excessive" under these factual circumstances or that the CDI's

38

determinations should be given deference could require the Court to revisit its prior rulings and impact future decisions at the summary judgment stage. Moving forward at this point could result in significant expenditures of time and resources by the parties to litigate issues that may ultimately be invalidated. As such, judicial efficiency would be promoted by a stay pending resolution of these appeals.

However, as noted by Plaintiff, such a stay is dependent on external events without a concrete, predetermined end date. *See In re PG&E Corp. Sec. Litig.*, 100 F.4th at 1084. Nonetheless, both appeals are fully briefed and, in the case of *Day*, oral arguments are being considered for July.

The Court, thus, does not consider the stay to be so open ended as to mitigate the judicial economy served by a stay pending resolution of issues that would impact proceedings in this litigation. *See, e.g.*, *Karoun Dairies, Inc. v. Karlacti, Inc.*, No. 08CV1521 AJB WVG, 2013 WL 4716202, at *4 (S.D. Cal. Sept. 3, 2013) (finding that "[s]taying proceedings pending the Ninth Circuit's decision could simplify and clarify the issues presented for the Court's consideration").

### 2.    Possible Damage If Stay Were to Be Granted

Second, Liberty Mutual asserts there is no potential harm to Plaintiff because "any potential delay will be narrow in time" and "temporary delay in recovering contract damages is not sufficient to warrant denying a stay." (Doc. No. 133-1 at 16–18.)

In opposition, Plaintiff argues the indefinite duration of the stay weighs "heavily against a stay in consideration of the time and effort already expended by Plaintiff to bring her motion for class certification before the Court that is ripe for consideration." (Doc. No. 138 at 17–18.) Moreover, Plaintiff asserts that the more time that passes, the more "unnecessar[y] . . . risk" Plaintiff bears of "losing key witnesses and other merits-based evidence" to the passage of time. (*Id.* at 18; *see also id.* at 6 ("A prolonged stay would hinder Plaintiff from undertaking necessary merits discovery which only becomes more challenging to obtain as time passes since the 2020-2021 class period."), 16 ("Nothing that

will come out of the *Davis* and *Day* appeals would change Plaintiff's need for additional merits-based discovery as this matter progresses after the pending motions are decided.").)

The Court acknowledges that evidence may become more difficult to procure as time elapses; however, the Scheduling Order Regulating Discovery and Other Pre-Trial Proceeding issued by Magistrate Judge Michelle M. Pettit on September 19, 2023, clearly stated that "[f]act and class discovery are **not** bifurcated[.]" (Doc. No. 51 ¶ 1 (emphasis added).) As such, Plaintiff has had a year and a half to conduct merits discovery, which undermines Plaintiff's argument of possible damage as partially self-inflicted. *See Ludlow v. Flowers Foods, Inc.*, No. 18-CV-01190 JLS-JLB, 2020 WL 773253, at *2 (S.D. Cal. Feb. 18, 2020) ("Plaintiffs argue that, as time passes, their 'memories and their ability to recall facts' will fade and pertinent witnesses may become unavailable. But this does not amount to prejudice sufficient to deny the stay. Discovery proceedings have already taken place 'and hence there is presumably no problem of preserving evidence.'") (citations omitted).

Additionally, Plaintiff is not seeking an injunction or declaratory relief, and there is no accruing harm. *Cf. Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110–12 (9th Cir. 2005). Rather, Plaintiff is only entitled to recover contract damages, the delay in receiving which is an insufficient basis to deny a stay. *See CMAX, Inc. v. Hall*, 300 F.2d 265, 268–70 (9th Cir. 1962).

Accordingly, the Court finds that possible damage to Plaintiff caused by a stay would be minimal, namely the delay in potential recovery of monetary damages, and far below a showing that "there is a fair possibility that [the] stay . . . will result in irreparable injury and a miscarriage of justice[.]" *CMAX, Inc.*, 300 F.2d at 268–69.

### 3.   Potential Hardship Suffered If Stay Were Denied

Liberty Mutual argues that, because resolution of the appeals will "provide guidance regarding the impact of the prior approval statutory regime" on this action, denial of a stay will possibly result in "unnecessary expenditures of costs, time, and resources" by proceeding in "merits and expert discovery and pre-trial preparation on issues that may

need to be revisited after" resolution of the *Day* and *Davis* appeals. (Doc. No. 133-1 at 18–19.)

Plaintiff argues that Liberty Mutual would suffer no harm if the Court were to deny the stay because both the motion for class certification and motion to exclude are already briefed and ripe for determination and the cost of further litigation is not considered a hardship sufficient to warrant a stay. (Doc. No. 138 at 15–16.)

The Court agrees with Plaintiff to the extent that Plaintiff asserts judicial economy and the interests of justice are served by issuing rulings on the briefed motions, which is why the Court has done so *supra* §§ II, III. However, any future motion for class certification relying on an opinion by Schwartz that mirrors the one issued in *Day*, would benefit from the Ninth Circuit's opinion on its sufficiency and admissibility. If the stay were denied, both parties would be required to proceed, expending further time and expense to litigate issues that may be invalidated or otherwise impacted by the Ninth Circuit's and the Court of Appeal's forthcoming decisions.

### D.    Conclusion

Having resolved the other pending motions, the Court finds that judicial efficiency and the potential hardship of proceeding outweigh the minimal potential damage to Plaintiff that may possibly be incurred by imposing a stay. Accordingly, having considered and weighed the applicable *Landis* factors, the Court **GRANTS** Liberty Mutual's motion to stay the proceedings. Moreover, the parties are **ORDERED to file** a joint status report **no later than** (1) **120 days** from the docketing of this Order **OR** (2) **seven days** after a ruling issued in either *Davis v. CSAA Ins. Exch.*, No. A169729, by the California Court of Appeal and/or of *Day v. GEICO*, No. 24-2201, by the Ninth Circuit, **whichever occurs first**.

## VI.    CONCLUSION

Based on the analysis set forth above, the Court **GRANTS** Liberty Mutual's motion to exclude (Doc. No. 102), **DENIES without prejudice** Plaintiff's motion for class certification (Doc. No. 84), **GRANTS** Liberty Mutual's request for judicial notice (Doc.

Nos. 102-5 (request); 102-6 (document to be judicially noticed)), for the limited purpose of recognizing it exists, and **GRANTS** Liberty Mutual's motion to stay the proceedings (Doc. No. 133). The parties are **DIRECTED to file** a joint status report no later than the earlier of (1) **120 days** from the docketing of this Order **OR** (2) **seven days** after a ruling issued in either *Davis v. CSAA Ins. Exch.*, No. A169729, by the California Court of Appeal and/or of *Day v. GEICO*, No. 24-2201, by the Ninth Circuit.

  **IT IS SO ORDERED.**

Dated:  March 21, 2025

Hon. Anthony J. Battaglia
United States District Judge